The Honorable the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention for the court is now sitting. God save the United States and this Honorable Court. All right, be seated please. All right, first case we'll call this morning is Aljizzani v. NBN and Mr. McClanahan we'll hear from you. May I begin, Your Honor? Good morning, Your Honors. My name is Dirk McClanahan, McClanahan Powers. I'm here on behalf of the plaintiff Mr. Maan Aljizzani and the appellant in this case. This case comes before this court following a dismissal at the motion to dismiss stage regarding an employment action regarding national origin. The primary focus of of the appeal and of the issues in this court are related to a comparator analysis or similarly situated that was the element that was attacked at the motion to dismiss and was ultimately granted. The the first thing I wanted to draw Your Honor's attention to I think is relevant for the analysis is the stage of the litigation in which this occurred. This was again at the motion to dismiss stage which is very early on. We cited to a number of cases in our brief that we think we believe stands for the state of law in that situation which is an employee is it a significant disadvantage at that stage of the litigation in terms of information control and we believe that the amended complaint that was submitted. I don't understand that. The plaintiff has full control of the complaint and alleges the facts and we determine whether those facts state a plausible cause of action. That that is absolutely true Your Honor and I don't disagree with you on that. What I meant is information control. So for example we believe the standard in this case for which was required in terms of what amount. But on that point let me just follow up. I mean particular here we're talking about I mean I can see certain cases where some information may be difficult to obtain from a plaintiff and we might take that into account. But here your clients were terminated for tweets, right? Posts or social media posts, tweets, things like that? Yes, Your Honor. And you know comparator if they had done so, tweets, posts and things wouldn't be something within the employer's control, correct? To the extent that the employer would have control of them deleting it, they would not. But whether the employer would have taken action or Sure what action may, that's something that might be the case. But at least in determining whether comparators have posted similar information, that information, that's not something that's within the exclusive control of the employer any more than it is you or your client, right? Yes, Your Honor. Okay. I thought this case gets even more particular. You alleged that your client posted some tweets. The employer directed him to pull them down. He refused. And then somebody else told him to pull them down a day or two later and he refused and he was fired. And that's what the complaint says. And regardless of whether they had a policy, regardless of what the tweet said, he just refused to obey his employer's order. And I don't know why, how you can have a cause of action when you just flatly tell your employer, he's full of it, I'm not going to obey. I mean, the employer had its reasons and he knew what the reasons were. He may disagree, he may have disagreed the effect of it, but he just clearly twice disobeyed a direct order to take him down and he was fired responsibly. It was not for a lot of other reasons, it was for disobedience. And I don't know where that gives you any kind of cause of action. He's a net will employee, wasn't he? He was a net will employee, Your Honor. If I may respond to that, Your Honor, the pleading in the complaint does not indicate that he was terminated for disobedience. That may eventually be the position that the defendant takes, but the position that he's, the basis he's given is that the postings violated the code. Well, that's, we can go into that and I don't know if it makes a bit of difference, but the complainant, I thought, made pretty clear that he refused twice and was therefore fired. Well, Your Honor, if, again, one of the things I think is important about these postings, these postings are not part of his job. These are not, these are not postings required or mandated as a task or an employment effort. These are separate posts as though any employee in any setting, whether they're a journalist or not, were to post on their own Facebook social media. Then they said that because of that posting, that posting violated the code within the organization for purposes of unethical posting. Whether our client agrees or disagrees or whether that is, at an evidentiary level, true or untrue, our position and what we've postulated in the complaint at the motion to dismiss stage is that it wasn't true and that they were using that code. All right, this is what you said in the complaint. This is what he said in the complaint. He said, shortly after plaintiff posted the tweet, Mr. El-Khalki called plaintiff and told him to delete the tweet. Plaintiff asked him to explain why Mr. El-Khalki did not provide a reason, so plaintiff did not delete the tweet. MBN thereafter suspended the plaintiff. That's for disobedience of that order. Second thing, you say plaintiff explained, this is a couple days later, plaintiff explained he would not delete the tweet because he did not understand what was wrong with his content. Defendant thereafter terminated plaintiff. Now, you don't think that those are two refusals to obey an order and the adverse action was suspension and then termination? I think the predicate to that conduct is the conduct that is at issue in the complaint. It doesn't matter. We're talking about whether he disobeyed. He was fired because he disobeyed the order twice. The employer made a judgment. He could disagree with his employer and they could talk about it, but to refuse to obey the order of the employer and then be suspended and then continue, persist after his suspension to take it down and he's fired. That's what the complaint says and I don't understand where this goes. I think our position, Your Honor, is if the order to take down your posting that you posted privately outside of employment because it allegedly violates this code and our position is that that allegation... It doesn't matter whether it violates it or not. The employer took a position and he disobeyed the order. He's at work. He's working for NBN. Not when he makes the posting, Your Honor. Well, sure he is. He's agreed to... I mean, there's no question about it. He's agreed to be neutral as a journalist and that they had provisions. They say, don't take positions, but regardless, we're not debating whether the code was properly violated or whether it's a good code. We're talking about a discrimination case and the question is, did they discriminate because he was Iraqi? And the answer is, the adverse action is alleged in the complaint was he disobeyed two orders. The adverse action, respectfully, Your Honor, is that they're telling him to take down a social media post he made not while he was at work on the basis that it violated the code. He inquired about that. They told him to take it down, a private posting that he made outside of his employment that, as we've pled, doesn't violate the code. And the question is, then they terminate him as a result. So did they terminate him for a non-discriminatory purpose? Our position would be that that is absolutely... You know, a disagreement over violating the code is the employer's entitlement to make his, its determination as to what the code means and it can enforce it. And when it tells this man, we believe that enforces it, take it down. And he says, I disagree. I refuse. The next, and he gets suspended. And then they tell him a few days later, this violates our code, take it down. He disagrees and they fire him. Now, we're not here to resolve whether the employer was right in interpreting its own code. We're here to determine whether that action, his firing, was because he was Iraqi. And there's nothing to suggest that. The suggestion in your complaint is that he was fired because he refused to take down the tweet. Respectfully, Your Honor, I think the, the focus of the complaint is whether or not, so for example, if they were to do the same situation to a non-Iraqi journalist, which we pled, and they don't find code violations for them, what's... You have nobody who was warned twice, ordered twice, not warned, ordered twice to take something down and was retained. You have not alleged anybody in your complaint that fits that category. And, Your Honor, this gets back to the initial issue of information disparity. If, if that level of, of requirement is needed at the motion to dismiss stage, where we would have to know whether or not other employees have been admonished at the same level for purposes of a misconduct that led to our client's termination, that's very... But that's your complaint. You're trying to allege that it wasn't because he violated the code, but they fired him not because he violated the code. They fired him because he was Iraqi. And the way you make that case, if that's your theory, is that you say other people who were not Iraqi had the same circumstances. They put it up, were told, and he refused to take it down, put it up, refused to take it down, that those persons were retained and not fired. Now that's what you would have to allege. Now, if you can't allege it, that's what 12 v. 6 is all about. Well, Your Honor, I think, respectfully, our, our position is that that analysis is coming down too far down the road. The, the assessment that we're trying to get the court to look at is, as soon as they start applying the code in an... Don't you have a problem there, too? Like, even if we assume his insubordination all flows from the request to take down this tweet, you want us to look at that, right? Yes, Your Honor. That is your problem, that that's a code violation or not a code violation. You think he's being singled out because he's Iraqi. But even there, the, the district court pointed out there's, it's hard to draw a plausible inference that this was discriminatory because the complaint doesn't offer the comparators. And I think that's Judge Quattlebaum's point earlier was that these tweets are available. For better or for worse, in your second case that you're going to argue next, you, you, you put them in there, right? And the court could compare them. But here, there's, there's nothing for the court to compare other than a vague, you know, statement that other people did similar things and were treated differently, right? That's, that's a conclusion, but that's, there's no facts to back it up. Well, I, so, thank you, Your Honor. I understand what you're, what you're saying. My response to that for purposes of the complaint is, I think when we are getting to the point where we're doing line by line analysis, I think my understanding of, and my read of the state is a little... So, you think you can just say they're comparators because they posted similar stuff without telling us at all what the similar stuff is? I think if we, so, to answer that question directly, Your Honor, I think there's, the answer is generally yes with caveat, which is, I think if you name someone in particular, you are, you're sort of hyper-focusing on the person. I think if you say generally like there's other employees who make tweets, that's very broad. I would, I would agree that that is too nebulous. But if I say Ms. Bidai posts tweets, they're offensive and aggressive tweets, the need to have the exact content feels like an additional step that gets us into an evidentiary analysis of the language, which I think the court circuit has... Why is that not... I mean, I think you'd agree that, you know, the 12B6 standard requires pleadings with enough specificity that they're not conclusory. You agree with that? Yes, Your Honor. Okay. Why is it not conclusory, even if you've identified a person, to say that they did similar stuff without giving us any more information than that? I think if we're saying that they've, that a particular individual has done additional, has also posted inappropriate content, I think that is a fairly specific allegation, as opposed to, I mean, I think if you were describing another misconduct, like a fight at work, if you said he got into a fight with work, it'd be like, well, who did he get in a fight with? How many punches were thrown? What was the nature of the fight? You know, was it fisticuffs? Did he kick him at one point? Those levels of details are well beyond what is necessary to establish that this individual also got into a physical altercation at work. It was inappropriate, and they didn't get fired, and I did. And I think the same analysis is true here, is how deep do you have to go in terms of identifying? I think to the point where we're actually posting side-by-side content, the only benefit of that is to do an evidentiary analysis of whether or not it's sufficient. And I think for the purposes of the case, it's plausibility of a claim, as opposed to specificity of the claim, Your That's my, my, that's where I believe the court and I saw differently at the proceeding. I have 35 seconds left, but I'll reserve for the remainder of the rebuttal. All right, that's fine. Okay, we'll have you back on rebuttal. All right, Mr. Bagley. May it please the court, Andrew Bagley from Kroll and Mooring on behalf of Middle East Broadcasting Networks. I think it will be comfortable to the court if I mention them as NBN for simplicity's sake. NBN, in this case, I think is facing a situation where it is dealing with a national origin discrimination case on behalf of an employee who's of Iraqi national origin. But please know that NBN is a company that you can tell from the complaint hires extensively from the Middle East. So a lot of the people are from the area. On the law, this case doesn't really push any boundaries. This is right down the middle of what comparators need to be. And we'll get to that in a moment. But your honors, what I think sets this case apart is that it's the complaint itself, the pleadings of the plaintiff that explain the legitimate non-discriminatory reason why he was terminated. The questions from the court have already pointed out the insubordination piece. And I'm not going to repeat all of that. But I will just mention one more. And that is that plaintiff has mentioned the journalistic code as an entity, as a thing. There's more to it. And that is, in fact, at paragraph 28 of the complaint. And that's where NBN told its employees, stay away from Iraqi politics. Because the situation in Iraq, I mean, this is a trip down memory lane where Iraq was the hot button in the Middle East, as opposed to where we are today. But what NBN said is, don't post about Iraq. Specifically, and I'm not posting any political content about Iraq on personal social media accounts. Well, it was not a week before plaintiff, in this case, did exactly that. And whether or not NBN interpreted the tweet correctly, it's undisputed from the complaint that NBN treated it, the tweet, as an insult against the highest Shiite cleric in the world. Counsel, can I ask you a kind of legal question? This dismissal by the district court was analyzed under the McDonnell-Douglas test, and the role of comparators in that burden-shifting test. Do we need to use that test? I mean, can't we just look at the text of the statute and ask whether there's any facts that plausibly allege discrimination based on national origin? Circumstantial, direct, whatever, without that utilization of that burden-shifting test? Your Honor, you're raising an important point, which goes to legal strategy of the defendant in this case. Because I think what the statute would say, that you also have to establish that the plaintiff was an employee in good standing at the time of the termination. In other words, you don't even get to the comparator analysis if you can't even show that he was in good standing. And one would say that if you disregard insubordinate nature, that in-your-face insubordinate, not only with your two levels up manager, but with executive management, you're not going to be in good standing. But I bring it up as a question of litigation strategy and that NBN decided not to rely on that in its motion to dismiss. I mean, maybe you went with the McDonnell-Douglas approach, and there's certainly law that says that. As I understand, that's a way of, you know, discerning how the text operates that the Supreme Court put up in a case. My question might not have been clear because I think comparator evidence would be evidence that a plaintiff could use if it was valid. I think direct evidence could be used if it was valid. I think any sort of circumstantial evidence, it just seems like to me, you can resolve this case without McDonnell-Douglas. And maybe you have a different view. Well, Your Honor, the way the complaint was presented and the way it was set up with the extensive discussion of comparators, we thought it appropriate to meet them on that field. Yeah, I'm not criticizing you for that at all. I think, I'm just asking. The district court seemed to get hung into McDonnell-Douglas and maybe it was the error for it to do it. Well, Your Honor. In other words, a comparator, you can make a pair of comparator allegations without doing the McDonnell-Douglas burden shifting propositions. The statute says a person who discriminates on account of national origin violates the law. And one way you can show that is that they treated an Iraqi in one manner and treated somebody else in a different manner. And not a burden shifting issue, it's an allegation, it's a complaint. But the district court got, went down the whole McDonnell-Douglas range. And I'm not sure that was, I think Judge Quattlebaum is raising a very serious legal point that's on 12b-6 or summary judgment motions, whether we ever get involved as McDonnell-Douglas. Well, in fairness, Your Honor, I have not analyzed a straight up statutory review of the word discriminate, for example. And the case law, for example, direct discrimination to determine whether the facts in the complaint, which to me are so obviously setting out the reason for the termination. In fairness, I, we did not engage in that analysis. Thank you. Based on the argument to date, I really don't have very much to say more than that, but I would be happy to answer any other questions that the court may have. All right. Thank you, Mr. Packett. Ms. Ambrose? Are you up? I would be, Your Honor, if there are questions specifically at the conservators, which is my role, but if not, I don't wish to take the time. All right. Very well. Mr. McClanahan? Good morning again, Your Honors. And I don't want to waste your time by speaking just to speak, so I'll try to address just an additional item. Although it looks like the court is viewing some of the structure of the claim in a different way than probably I would like to use. One of the things I did think that came up and appeared to be an issue in the case was whether or not they had to have the same supervisor and the relevant factor analysis. And I think one of the, when I came in here today and what I was thinking was- to try to demonstrate that your client was treated differently. I think what you have to allege is enough facts on which you can plausibly conclude that one person was treated differently from the other. Now, whether it's the same employer or whatever, but the question is you can't just say in your complaint, A, it was treated differently from the others and leave it at that. They all had the same jobs and everything. They had that. Really what we're talking about, here's a man that was fired because he didn't take down a tweet that the employer thought related to the Iraqi circumstance. And you want to try to demonstrate that that was because he was Iraqi. Well, the way you would demonstrate that and that you chose to do that, and that's fine, is to say others in a similar situation who put up posts about Iraqi were not terminated in similar circumstances. And you could even go further and say, indeed, they were warned, but they were not fired. But I don't see any of that in the complaint. As a matter of fact, your next complaint goes into more detail, but the question is how do we determine whether you've alleged enough facts that plausibly alleges a cause of action for discrimination as opposed to insubordination? So, Your Honor, if I may, I appreciate your initial point, so I'll just go through them quickly as I can. Because I was concerned that the underlying court was focusing on that, oh, it's got to have a supervisor. I agree. I think the law is clear that that is not an original analysis. I really like the quotes that we put in the brief because I think those courts did an excellent job articulating what I think is the correct legal standard, which you've just, I think, identified. Judge Brinkema in the next case, right, she agreed with you on the supervisor analysis, that what matters is who's enforcing the code. Is that right? I think that was part of her analysis. They had a different view on that. But I agree. And as it relates to one of the issues, Your Honor, and I don't, you know, as a plaintiff's lawyer who does, I do both types, but I stay the lens more through plaintiff because I tend to be more plaintiff than defendant on these employment cases. One of the allegations you were just asking counsel about is, well, do you have to go McDonnell Douglas? Well, no, you can prove discrimination through direct circumstantial evidence or you can prove it through McDonnell Douglas. And in a complaint, you don't need to allege the burdens of proof at trial. As a matter of fact, the Supreme Court's directed us not to. And in McCleary-Evans, we pointed out that we don't do the McDonnell Douglas. We go to the statute. The question is a plausible claim would be a plausible claim under Title VII. And so the question is, have you fulfilled the elements, plausibly shown that you've fulfilled the elements of a Title VII claim? And that's the 12V6 standard, isn't it? The sufficiency of the complaint? That is the standard, Your Honor. I think one of the things we pled that was, the court did not like in either of the first two. But one of the arguments we actually open up with is there was the direct, there's a direct discrimination claim here, which is we didn't violate the code. So even if we're not comparing to anyone else, this allegation that we violated a code by, and I think Mr. Al-Jazani's is the most straightforward in that, that tweet without any framework is an innocuous statement. But it's not, I mean, you've also pleaded that there was a direct verbal warning, do not post about Iraqi politics, right? So whether, whether that's the code or not, that was the instruction, right? And that's the instruction that was violated. But I think our position is that that is a discriminatory instruction. You, if I was an American abroad and they said, hey, do not post about America, on whether it's good, bad, and different, the standard is don't post against the code. I mean, that's your argument. And, and, and, yeah, one might say that's right. But one might say that if everyone is instructed not to post about America, that's not a discriminational national origin, just because it encompasses Americans as well. In my, I'm over my time. My only comment would be that these, these are Iraqis. So then doing journalism about Iraq and, you know, the notion that they can't speak about their own country that's going through incredible political issues because it's, we don't want you talking about Iraq is, I think, part of the entire framework of this discrimination. I'm sorry, Your Honor, for going on my time. Thank you. Uh, the next case, uh, is, uh, uh, Isaac versus MBN and it is a parallel case. We have the same counsel. We normally come down and greet counsel. We're going to come down and greet counsel, but let's do it after the second case. So we, we don't need to greet you twice, although that might be a nice thing to do. So if it's okay with you, uh, we'll begin with the next case.
judges: Paul V. Niemeyer, A. Marvin Quattlebaum Jr., Allison J. Rushing